**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SIMPSON G. TURLEY, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>DRAFTKINGS INC. and DRAFTKINGS HOLDINGS INC.<br><br>      Defendants. | Case No.  1:23-cv-10054<br><br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANED |

Plaintiff Simpson G. Turley ("Plaintiff") on behalf of himself and all others similarly situated, through his attorneys, alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

**<u>INTRODUCTION</u>**

1. DraftKings Inc. and DraftKings Holdings Inc. (collectively, "DraftKings") operate and market themselves as offering online and retail daily fantasy sports competitions and sports betting services.

2. In particular, DraftKings operates online and retail sportsbooks, fantasy sports competitions, casinos, marketplaces, and its "Reignmakers NFT Game." DraftKings offers its online and retail sportsbook and sports betting in twenty-one states. However, DraftKings operates its online sports betting and daily fantasy sports competitions as distinct products.

3. DraftKings markets itself as the "industry leader" in daily fantasy sports ("DFS") competitions. Further, DraftKings claims to offer "new contests [] every day" across multiple

1

sports and sports leagues, including for football and National Football League ("NFL") games.[1] DraftKings is the "Official Daily Fantasy Partner of the NFL" and is the "best place for all [] fantasy football action."[2]

4.    As part of DraftKings' fantasy football offerings, customers can "[d]raft a lineup of NFL players while staying within the salary cap. Then watch as they rack up points for touchdowns, yards gained, and more during the games. If your lineup scores enough points, you'll win cash prizes—even if you don't come in first."[3] DraftKings ensures that there is "no season-long commitment, so [customers] can draft a new team every week and not worry about draft day busts or injuries ruining your season."[4] DraftKings explains that customers "[d]on't need to finish first to win," can "[p]lay daily, season-long, and in-game contests," and can "[w]in big cash prizes in public tournaments."

5.    On Monday, January 2, 2023, the Buffalo Bills and the Cincinnati Bengals were slated to play in an NFL game, as part of Week 17 of the NFL's 2022 regular season. DraftKings offered numerous fantasy football contests involving this game, with the statistics accrued during the game and the results of the game directly affecting these contests.

6.    The Buffalo Bills-Cincinnati Bengals game began as scheduled. During the first quarter of the game—with 5:58 left to play in the quarter—shortly after making a tackle on Cincinnati Bengals wide receiver Tee Higgins, Buffalo Bills safety Damar Hamlin collapsed on the field. Medical assistance was provided to Hamlin and he remains hospitalized but, thankfully, is showing continued improvement. Immediately following this injury, the NFL suspended the

---

[1] https://www.draftkings.com/dfs.
[2] https://www.draftkings.com/fantasy-football.
[3] *Id.*
[4] *Id.*

Buffalo Bills-Cincinnati Bengals game. At the time, the NFL did not cancel, reschedule, or otherwise postpone the game, but the NFL did decide on January 3, 2023 that it would not resume play in the Buffalo Bills-Cincinnati Bengals game until a later week.[5]

7.     On January 3, 2023, DraftKings began contacting its DFS participants, including Plaintiff Turley and the Class Members, to explain that DraftKings had decided to cancel and refund entries for certain NFL fantasy football contests. Specifically, DraftKings stated: "[E]ntries for Showdown and Flash Draft contests will be canceled and refunded." DraftKings also canceled all single-game Reignmakers contests for the Buffalo Bills-Cincinnati Bengals game. **Exhibit 1**.

8.     Notably, however, DraftKings did not cancel and refund entries in other NFL fantasy football contests, opting instead to pay out those contests based on "current, accrued points" which included accrued points from the Buffalo Bills-Cincinnati Bengals game. Specifically, DraftKings explained that Classic contests, including for "Sunday-Monday slates, will be paid out with current, accrued points." Further, "[a]ny lineups with a drafted player in the CIN/BUF game from these sets will receive EF-Winnings to ensure no entries with a player from this game will be at a net loss." And for Best Ball contests, DraftKings explained that "[i]f the game is not played,[6] [DraftKings] will pay out based on current standings." Exh. 1.

9.     DraftKings has improperly paid out on certain NFL DFS contests, while refusing to pay out on other contests, all in violation of DraftKings's own established rules for each contest. DraftKings arbitrarily chose to apply the statistics from the suspended Buffalo Bills-Cincinnati Bengals game (as played up to 5:58 remaining in the first quarter) to certain contests and offer

---

[5] Since that time, on Thursday, January 5, 2023—some three days after the NFL originally suspended the game—the NFL officially canceled the Buffalo Bills-Cincinnati Bengals game, calling it a no-contest.

[6] Following DraftKings' announcement, the NFL determined that the game would not resume. *Id.*

payouts to customers leading in those contests, while refusing to apply the same statistics from the game to other contests and refusing to offer the same payouts to customers leading in those contests. These determinations by DraftKings are improper, are in violation of DraftKings's own contest rules, are a breach of contract, violate state consumer protection laws, and deprive Plaintiff Turley and the Class Members of winnings to which they are undoubtedly entitled.

## JURISDICTION

10.     This Court has subject matter jurisdiction of this action pursuant to DraftKings's Terms of Use, which provides this Court shall have "exclusive jurisdiction . . . for proceedings involving any and all disputes, claims or controversies arising out of or relating to . . . any use of the [DraftKings] Website (including all commercial transactions conducted through the Website)."[7] Plaintiff Turley's claims and those of putative Class Members arise out of their use of the DraftKings website and their entry into contests offered by DraftKings on the website.

11.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332(d)(2) and (6) of the Class Action Fairness Act of 2005 ("CAFA") because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

12.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

13.     Plaintiff Simpson G. Turley is a resident of the State of New York. He maintains a DraftKings account. Plaintiff Turley paid entry fees and participated in multiple NFL Showdown

---

[7] https://myaccount.draftkings.com/documents/us-terms-of-use.

DFS contests for the Buffalo Bills-Cincinnati Bengals game offered by DraftKings on January 2, 2023. Despite being ranked in the money in contests when the Buffalo Bills-Cincinnati Bengals game was suspended, DraftKings refused to pay Plaintiff Turley the winnings to which he was entitled.

14.     Defendant DraftKings Inc. is a Delaware corporation, with its principal place of business located in the Commonwealth of Massachusetts, at 222 Berkeley Street, Boston, Massachusetts 02116.

15.     Defendant DraftKings Holdings Inc. is a Nevada corporation, with its principal place of business located in the Commonwealth of Massachusetts, at 222 Berkeley Street, Boston, Massachusetts 02116.

## GENERAL FACTUAL ALLEGATIONS

### DraftKings's "Daily Fantasy Sports" Contests

16.     In addition to sports betting, DraftKings offers DFS contests across multiple sports, including NFL fantasy football contests. Thousands of customers participate in DraftKings's NFL fantasy football contests each week, including in daily, in-game, weekend-long, and season-long contests. Although each contest is not required to have an entry fee, nearly all NFL fantasy football contests offered by or hosted by DraftKings require an entry fee.

17.     Pursuant to DraftKings's Terms of Use, "[e]ach Contest or promotion [offered by DraftKings] is governed by its own set of official rules."[8] And payment of winnings by DraftKings is likewise governed by the individual contest's rules and must be done "in a manner consistent with the Rules of the Contest."[9]

---

[8] https://myaccount.draftkings.com/documents/us-terms-of-use.
[9] *Id.*

18.    "Any violation of Contest rules" constitutes "conduct that would be deemed improper" under the Terms of Use.[10]

19.    The Terms of Use also note that the suspension of any game is governed by the contest's specific rules, which "are available in the 'Rules and Scoring' tab of each Contest."[11] Thus, the contest's rules govern how a suspension affects a given contest—not DraftKings's Terms of Use, "house rules," or the exercise of DraftKings's discretion.

20.    DraftKings offers numerous "game styles" in which customers can participate in fantasy football contests. These include but are not limited to: "NFL Classic" game styles, "NFL Tiers" game styles, "NFL Showdown" game styles, "NFL In-Game Showdown" styles, "NFL Pick" game styles, in addition to many more. Each game style maintains its own rules.[12]

21.    DraftKings's NFL contest rules each have provisions for "Cancelled, Postponed and Rescheduled Games" and for "Suspended or Shortened Games." The specific rules when these provisions may apply differ depending on the particular game style and contest. However, certain game styles and contests may have the same, or similar, rules for these provisions as other different games styles and contests. Most of these rules, including these specific provisions, can be found on DraftKings's website under the general "Rules and Scoring" page.[13] Moreover, once a customer enters and becomes a participant in a specific contest, the contest's page should include the applicable rules.

22.    For example, for NFL "Classic" game style contests, if an NFL game is suspended or shortened, the following rules apply:

>      DraftKings uses official NFL statistics and only includes statistics

---

[10] *Id.*

[11] *Id.*

[12] https://www.draftkings.com/help/rules/1.

[13] *Id.*

from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[14]

23.     For NFL "Tiers" game style contests, if an NFL game is suspended or shortened,

the following rules apply:

DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[15]

24.     For NFL "Showdown" game style contests, if an NFL game is suspended or

shortened, the following rules apply:

DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[16]

25.     DraftKings offers multiple Showdown fantasy football contests with slight

variations. For example, DraftKings offers "NFL In-Game Showdown H2" and "NFL In-Game

Showdown Q4" game style contests. These include a slight modification on the rules if an NFL

game is suspended or shortened. For example, for "NFL In-Game Showdown H2" contests, if an

NFL "game is suspended or shortened before the second half of the game [begins], all contest

entries will be cancelled and refunded." However, if the game is suspended or shortened during

---

[14] https://www.draftkings.com/help/rules/1/1 (emphasis added).
[15] https://www.draftkings.com/help/rules/1/50 (emphasis added).
[16] *E.g.*, https://www.draftkings.com/help/rules/1/96 (emphasis added); *see also* https://www.draftkings.com/help/rules/1/192; https://www.draftkings.com/help/rules/1/236.

the second half, "the statistics generated in the second half before the game is suspended will count in Game Sets containing said game."[17] For "NFL In-Game Showdown Q4" contests, if an NFL "game is suspended or shortened before the fourth quarter of the game [begins], all contest entries will be cancelled and refunded." However, if the game is suspended or shortened during the fourth quarter, "the statistics generated in the second half before the game is suspended will count in Game Sets containing said game."[18]

26.    For NFL "Pick" game style contests, if an NFL game is suspended or shortened, the following rules apply:

> DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[19]

27.    For NFL "Snake" game style contests, if an NFL game is suspended or shortened, the following rules apply:

> DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[20]

28.    And other NFL game style contests maintain these same rules if an NFL game is suspended or shortened:

> DraftKings uses official NFL statistics and only includes statistics

---

[17] https://www.draftkings.com/help/rules/1/108.
[18] https://www.draftkings.com/help/rules/1/110.
[19] *E.g.*, https://www.draftkings.com/help/rules/1/200 (emphasis added);
https://www.draftkings.com/help/rules/1/230; https://www.draftkings.com/help/rules/1/233.
[20] *E.g.*, https://www.draftkings.com/help/rules/1/189 (emphasis added);
https://www.draftkings.com/help/rules/1/192.

from games NFL deems to be official. ***If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.*** Any statistics generated on a later date when the game resumes will not be included.[21]

**The NFL's Decision to Suspend the Buffalo Bills-Cincinnati Bengals Game**

29.     On Monday, January 2, 2023, as part of Week 17 of the NFL's 2022 regular season, the Buffalo Bills and the Cincinnati Bengals were scheduled to play in a Monday Night Football game. At approximately 8:30 p.m. ET, the game began as scheduled.

30.     The Cincinnati Bengals received the opening kickoff. While on offense, the Bengals scored a passing touchdown and PAT. After the ensuing kickoff, the Buffalo Bills went on offense and scored a field goal. At that point in the game, the score was 7-3 in favor of the Cincinnati Bengals, with numerous players from both teams accumulating statistics (and thus, accumulating points in the fantasy football contests)

31.     Shortly thereafter, with 5:58 left to play in the quarter—shortly after making a tackle on Cincinnati Bengals wide receiver Tee Higgins, Buffalo Bills safety Damar Hamlin collapsed on the field when he suffered a cardiac arrest. Hamlin received immediate medical assistance on the field and was taken to a local hospital. Hamlin remains hospitalized but continues to show signs of improvement.

32.     Following this stoppage of play, the NFL suspended the Buffalo Bills-Cincinnati Bengals game, as indicated here:

---

[21] *See, e.g.*, https://www.draftkings.com/help/rules/1/231.



33.    At the time, the NFL did not cancel, reschedule, or otherwise postpone the game, but the NFL did decide on January 3, 2023, that it would not resume play in the Buffalo Bills-Cincinnati Bengals game until a later week, as indicated here:



FOR IMMEDIATE RELEASE
1/3/23

**NFL UPDATE ON BILLS-BENGALS GAME AND WEEK 18 SCHEDULE**

The NFL continues to be in regular contact with the medical team caring for Damar Hamlin, and also the Bills and Bengals organizations and the NFL Players Association.

After speaking with both teams and NFLPA leadership, NFL Commissioner Roger Goodell informed the clubs today that the Bills-Bengals game will not be resumed this week.

The NFL has made no decision regarding the possible resumption of the game at a later date.

The league has not made any changes to the Week 18 regular season schedule.

We will continue to provide additional information as it becomes available.

**DraftKings's Decision to Cancel Certain Daily Fantasy Sports Contests but Not Others**

34.    On January 3, 2023, following the NFL's announcement that the Buffalo Bills-Cincinnati Bengals game would not resume that same week, DraftKings determined, "per [its] house rules," that it would cancel and refund entries for certain NFL fantasy football contests,[22] but that it would still pay out participants in certain other NFL fantasy football contests with the statistics from the Buffalo Bills-Cincinnati Bengals included. A copy of the email communication DraftKings sent to contest participants, which is attached as Exhibit 1 to this Complaint, is included here:

---

[22] Additionally, DraftKings voided "all wagers on the game that have not [yet] been determined, such as spreads and money lines." Exh. 1.

Everyone at DraftKings continues to keep Damar Hamlin in our thoughts and prayers. With the NFL announcing the Bills-Bengals game will not be resuming this week, per our house rules, all wagers on the game that have not been determined, such as spreads and money lines, have been voided.

For DFS, entries for Showdown and Flash Draft contests will be canceled and refunded. DFS Classic set contests, such as Sunday-Monday slates, will be paid out with current, accrued points. Any lineups with a drafted player in the CIN/BUF game from these sets will receive EF-Winnings to ensure no entries with a player from this game will be at a net loss. Best Ball contests will remain live until the NFL makes a final determination on the game's status. If the game is not played, we will pay out based on current standings.

Single game Reignmakers contests for the game will be canceled. If the game is to be played, contests will be reposted with the same contest sizing. If the game is not played, $100,000 in prizes will be allocated across each team's first playoff game Showdown. Deep Roster format Reignmakers contests will be paid out as normal.

If you have any questions please reach out to our Customer Experience team at support@draftkings.com.

Thank you,

The DraftKings Team

35.   Specifically, DraftKings explained:

> For DFS, entries for Showdown and Flash Draft contests will be canceled and refunded. Classic set contests, such as Sunday-Monday slates, will be paid out with current, accrued points. Any lineups with a drafted player in the CIN/BUF game from these sets will receive EF-Winnings to ensure no entries with a player from this game will be at a net loss. Best Ball contests will remain live until the NFL makes a final determination on the game's status. If the game is not played, we will pay out based on current standings.

Exh. 1.

36.   In other words, the statistics accrued in the Buffalo Bills-Cincinnati Bengals game up to the point at which the NFL suspended the game—and necessarily, the points scored in fantasy football up to that point based on that game—would apply only in those contests DraftKings unilaterally chose. Namely, DraftKings determined that the "current, accrued points" based on statistics from the Buffalo Bills-Cincinnati Bengals game would apply only in NFL Classic contests, with the currently leading participants in those contests receiving credit for points accrued up to that point (based upon statistics from the Buffalo Bills-Cincinnati Bengals game up to the

point it was suspended) and their winnings—rather than canceling the contests and offering refunds. However, DraftKings refused to take the same approach for Showdown and Flash Draft contests.

37.     This conduct directly violated the rules of all Showdown contests (with the exception of "NFL In-Game Showdown H2" and "NFL In-Game Showdown Q4" contests). And, upon information and belief, this also violated the rules for Flash Draft contests.[23]

38.     For an NFL Showdown contest, DraftKings's rules provide that **"*If the NFL declares a game 'suspended' then the statistics generated before the game is suspended <u>will count</u> in Game Sets containing said game.*"**[24]

39.     This language precisely matches the language provided in DraftKings's rules for NFL Classic contests: **"*If the NFL declares a game 'suspended' then the statistics generated before the game is suspended <u>will count</u> in Game Sets containing said game.*"**[25]

40.     Despite DraftKings's rules sharing the **same language** across multiple fantasy football game styles, including the Showdown and Classic game styles, DraftKings has chosen to treat them differently, in plain violation of the terms and rules it itself created.

41.     Pursuant to the language in the rules applying to the suspension of an NFL game after kickoff, "the statistics generated before the game is suspended **<u>will count</u>**." DraftKings wholly ignored this language when it unilaterally canceled and refunded Showdown and Flash Draft contests solely because the Buffalo Bills-Cincinnati Bengals game was suspended, while it

---

[23] Plaintiff brings this allegation upon information and belief because, despite a diligent search and investigation, he cannot determine the applicable rules for Flash Draft contests. DraftKings does not provide the rules for Flash Draft contests on its NFL Rules & Scoring page, as it does for numerous other NFL game style contests. *Cf.* https://www.draftkings.com/help/rules/1.

[24] *E.g.*, https://www.draftkings.com/help/rules/1/96 (emphasis added); *see also* https://www.draftkings.com/help/rules/1/192; https://www.draftkings.com/help/rules/1/236.

[25] https://www.draftkings.com/help/rules/1/1 (emphasis added).

simultaneously decided to pay out participants in Classic contests based on the then-current, accrued points (based on statistics from the game up to the point the game was suspended).

42.     Due to the sheer volume of Showdown and Flash Draft contests, which involved players from the January 2, 2023 Buffalo Bills-Cincinnati Bengals game, hundreds, if not thousands, of participants in these contests were entitled to winnings at the time the game was suspended.

43.     Pursuant to its own established rules applicable to the suspension of an NFL game, participants in these Showdown and Flash Draft contests were entitled to be paid out based on the "current, accrued points," based on the "statistics generated before the game was suspended"—the approach that DraftKings took for Classic contests, but refused to take for Showdown and Flash Draft contests.

44.     In short, DraftKings violated the applicable contest rules and, as a result, improperly violated its own Terms of Use.[26]

## PLAINTIFF'S FACTUAL ALLEGATIONS

45.     Plaintiff Simpson G. Turley is a resident of Buffalo, New York. He maintains an account with DraftKings under the username BillsSGT. On January 2, 2023, he participated in the "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" and the "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" DFS contests offered and hosted by DraftKings. In order to participate in these contest, Plaintiff Turley paid a $222 entry fee and a $444 entry fee, respectively.

46.     As part of these contests, Plaintiff Turley drafted multiple players to his fantasy football team from the Buffalo Bills and Cincinnati Bengals teams, who were participating in the

---

[26] https://myaccount.draftkings.com/documents/us-terms-of-use.

Buffalo Bills-Cincinnati Bengals NFL game on January 2, 2023.

47.    With 5:58 remaining in the first quarter of the Buffalo Bills-Cincinnati Bengals game, play was suspended following an injury stoppage. Play did not resume and the game was suspended.

48.    At the time the Buffalo Bills-Cincinnati Bengals game was suspended on January 2, 2023, Plaintiff Turley's fantasy football team had accrued 23.35 points and was ranked in first place in the "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" contest. At that point, the DraftKings website indicated that Plaintiff Turley's team was ranked in first place in the contest and his winnings totaled $5,000, as shown in the screenshot included here:



49.    Plaintiff Turley's fantasy football team had accrued 25.35 points and was ranked in second place in the "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" contest. At that point, the DraftKings website indicated that Plaintiff Turley's team was ranked in second place in the contest and his winnings totaled $3,000, as shown in the screenshot included here:



50.     On January 3, 2023, DraftKings contacted Plaintiff Turley via email to inform him that all "entries for Showdown and Flash Draft contests [were being] canceled and refunded." Exh. 1. Plaintiff Turley's entry in the "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" and "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" contests were canceled, and his DraftKings account was automatically refunded the $222 and $444 entry fees. At no point did Plaintiff Turley receive the $5,000 winnings or $3,000 winnings to which he was entitled.

51.     In that same email communication, Plaintiff Turley was informed that DraftKings was paying out winnings in other DFS contests based on the "current, accrued points," including those points accrued by Buffalo Bills and Cincinnati Bengals players up to the point in the Buffalo Bills-Cincinnati Bengals game when the game was suspended. Based upon this communication from DraftKings, participants in these other DFS contests who were entitled to winnings at the point at which the Buffalo Bills-Cincinnati Bengals game was suspended were paid their winnings, unlike Plaintiff Turley.

52.    Plaintiff Turley participated in the "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" and "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" contests, which specifically included the following rules on "Suspended or Shortened Games":

> DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official. If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game. Any statistics generated on a later date when the game resumes will not be included.

A screenshot of the contest rules for "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" are included here as an example:



53.    Accordingly, DraftKings's determination to cancel and automatically refund Plaintiff Turley's account based upon his participation in the "NFL Showdown $20K Two Point

Conversion [$5K to 1st] (BUF vs CIN)" and  "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" contests violated DraftKings's own rules and the specific rules for the contests.

54.     As a result of DraftKings's conduct, Plaintiff Turley suffered harm. Specifically, Plaintiff Turley was harmed by not being paid monies to which he was entitled in the amount of $5,000 which represent his winnings in the "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" contest and $3,000 which represented his winnings in the "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" contest.

## CLASS ACTION ALLEGATIONS

55.     Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff brings this action on behalf of himself and the following proposed Nationwide Class:

> **Nationwide Class:** All persons in the United States who entered a Showdown or Flash Draft contest offered by DraftKings, which included the January 2, 2023 NFL game between the Buffalo Bills and the Cincinnati Bengals, and to whom the contest indicated winnings were owed at the time the game was suspended.

56.     The Class Period begins from the length of the greatest applicable statute of limitations to the present.

57.     Excluded from the Classes are: (i) Defendants, any entity in which any Defendant has a controlling interest or which has a controlling interest in any Defendant, and Defendants' legal representatives, predecessors, successors and assigns; (ii) governmental entities; (iii) Defendants' employees, officers, directors, agents, and representatives and their family members; (iv) all persons who make a timely election to be excluded from the class; and (v) judge(s) and staff to whom this case is assigned, and any member of the judge's or judges' immediate family.

58.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

59.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Members of the proposed Class are so numerous that the individual joinder of all absent Class Members is impracticable. Class Members participated in hundreds, if not thousands, of the relevant DFS contests. Further information regarding the number of Class Members is ascertainable by appropriate discovery. Plaintiff is informed and so believes, based upon the nature of the contests involved, that the proposed Class includes many Class Members who are geographically diverse so that joinder of all Class Members is impracticable.

60.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of putative members of the Class in that each participated in one of the relevant DFS contests and was entitled to winnings in those contests at the time the Buffalo Bills-Cincinnati Bengals game was suspended on January 2, 2023.  Plaintiff and the Class Members were comparably injured through DraftKings's uniform course of misconduct described herein. Plaintiff and Class Members all suffered the same harm as a result of DraftKings's decision to refuse to pay out winnings in the relevant DFS contests and instead to cancel and refund these contests. By advancing his claims, Plaintiff will also advance the claims of all Class Members because Defendants' unlawful conduct caused Class Members to suffer similar harm.

61.     **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff's interests and the interests of all other members of the Class are identical, and Plaintiff is cognizant of his respective duties and responsibilities to the Class Members. Further, the interests of the Class Members are not

conflicting or divergent but, rather, are common. Accordingly, Plaintiff can fairly and adequately represent the interests of the Class. Moreover, Plaintiff's counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiff and his counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class Members' interests.

62.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. Among the questions of law or fact common to the proposed Class are:

a.      whether DraftKings determined to cancel or refund Class Members' entries in the relevant DFS contests based upon the NFL's suspension of the Buffalo Bills-Cincinnati Bengals game on January 2, 2023;

b.      whether DraftKings' conduct violated the rules established by DraftKings for the relevant DFS contests;

c.      whether DraftKings' conduct constituted a violation of its Terms of Use;

d.      whether DraftKings' conduct constituted a breach of contract with Class Members;

e.      whether DraftKings's conduct violates the consumer protection statutes at issue in this litigation;

f.      whether DraftKings's conduct was unjust and in violation of principles of justice, equity, and good conscience;

g.      whether Plaintiff and the Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages and the amount thereof; and

h.     whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction.

63.    **Superiority – Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense required to individually litigate their claims against DraftKings, and thus, individual litigation to redress DraftKings's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

64.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**. Class certification is also appropriate because DraftKings has acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the class as a whole. Plaintiff asserts claims for injunctive relief and restitution arising from DraftKings's determination to refuse to pay out winnings to Plaintiff and the Class Members in violation of the relevant DFS contest rules and DraftKings's own Terms of Use, and in breach of contract.

65.     **Certification of Particular Issues – Federal Rule of Civil Procedure 23(c)(4)**. This action is also properly maintainable under Rule 23(c)(4) in that particular issues common to the Class, as described above in part, are most appropriately and efficiently resolved via class action, and would advance the disposition of this matter and the parties' interests therein.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (On behalf of Plaintiff Turley and the proposed Class)

66.     Plaintiff reasserts and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

67.     Plaintiff and Class Members maintained accounts with DraftKings in order to participate in the relevant DFS contests. Plaintiff and Class Members used their DraftKings accounts to pay entry fees to participate in the relevant DFS contests.

68.     In creating their DraftKings accounts, and in entering the relevant DFS contests, Plaintiff and Class Members entered into a valid and enforceable agreement with DraftKings to participate in the relevant DFS contests for the applicable entry fee with the understanding that Plaintiff and Class Members were competing in the relevant DFS contests for the potential winnings, as listed for each contest and by DraftKings.

69.     Moreover, in creating their DraftKings accounts, Plaintiff and Class Members, along with DraftKings, agreed to be bound by DraftKings's Terms of Use.[27] These Terms of Use, as a condition of participation in DraftKings and its contests, requires that DraftKings and contest participants not violate the contest rules.[28]

70.     Material parts of this agreement included:

---

[27] https://myaccount.draftkings.com/documents/us-terms-of-use.
[28] *Id.* (explaining that "[a]ny violation of Contest rules" constitutes "conduct that would be deemed improper" and in violation of the Terms of Use).

a.    that DraftKings, Plaintiff, and the Class Members would abide by DraftKings's Terms of Use;

b.    that DraftKings would pay out the applicable winnings to Plaintiff and Class Members who accrued the most points in the relevant DFS contests; and

c.    that DraftKings would abide by the rules applicable to each relevant DFS contest.

71.    A meeting of the minds occurred, and Plaintiff and Class Members fully performed their obligations by paying money to participate in the relevant DFS contests.

72.    Accordingly, a contract was formed between Plaintiff and Class Members and DraftKings that, in exchange for the payment of the applicable entry fees, DraftKings would pay out the listed winnings to Plaintiff and Class Members based on the points accrued in the relevant DFS contests.

73.    Plaintiff and Class Members scored enough points in the relevant DFS contests at the time when the Buffalo Bills-Cincinnati Bengals game was suspended in order to be entitled to winnings pursuant to each contest's rules.

74.    DraftKings breached this contract by refusing to pay out the winnings to which Plaintiff and Class Members were entitled by virtue of their accrued points and placement in the relevant DFS contests at the time when the Buffalo Bills-Cincinnati Bengals game was suspended, in direct violation of DraftKings's own established rules, the rules of each relevant DFS contest, and its Terms of Use.

75.    Plaintiff and Class Members would have refused to pay the applicable entry fees to participate in the relevant DFS contests had they known that DraftKings would refuse to pay out winnings to which they were entitled, in direct violation of DraftKings's own established rules.

76.     Plaintiff and Class Members did not receive the benefit of their bargain. In entering the relevant DFS contests, Plaintiff and Class Members bargained to participate in the contests—and pay the applicable entry fees—to play the contest and compete for the chance to earn the applicable winnings. But because DraftKings arbitrarily canceled these contests in violation of DraftKings's own established rules, Plaintiff and Class Members were not paid out on the winnings they had earned and to which they were entitled in the contests, which far exceeded the entry fees paid.

77.     As a result of DraftKings's breach, Plaintiff and Class Members suffered damages in the amount of the difference between the winnings to which they were entitled and the amount paid for their entry fees, which were refunded when DraftKings canceled the relevant DFS contests arbitrarily, improperly, and in breach of contract.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of Plaintiff Turley and the proposed Class)**

78.     Plaintiff reasserts and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

79.     New York General Business Law § 349 ("NY GBL § 349") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ." N.Y. Gen. Bus. Law § 349(a).

80.     Under NY GBL § 349, "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." *Id.* § 349(h).

81.     DraftKings's foregoing acts and practices were directed at consumers.

82.     DraftKings's foregoing acts and practices occurred in the course of its business of offering DFS contests to customers, including Plaintiff and Class Members.

83.     DraftKings violated NY GBL §349 by misrepresenting, omitting, concealing, or failing to disclose material facts in listings for, advertisements for, information for, or the rules of the relevant DFS contests, or elsewhere on DraftKings's website regarding DraftKings's ability to arbitrarily cancel DFS contests at its discretion, even when in direct violation of the applicable rules.

84.     In listing and offering the relevant DFS contests on its website, DraftKings presented to customers, including Plaintiff and Class Members, the opportunity to enter the relevant DFS contests for an opportunity to compete to win the listed winnings.

85.     DraftKings presented rules applicable to the relevant DFS contests, which would be binding and controlling on participants in the contests and would govern how DraftKings could run the contests.

86.     Contrary to the representations made to customers, and directly contrary to the applicable rules for the relevant DFS contests, DraftKings arbitrarily canceled the relevant DFS contests.

87.     DraftKings omitted, concealed, and failed to disclose the fact that it, apparently, reserved a right to cancel contests at its sole discretion, and could—and would—ignore the governing rules applicable to the relevant DFS contests to refuse to pay out winnings to which participants, including Plaintiff and Class Members, were entitled.

88.     DraftKings conduct constitutes deceptive and unfair acts and practices in violation of NY GBL § 349.

89.     The fact that DraftKings listed and offered the relevant DFS contests on its website,

in part, induced customers to participate in the relevant DFS contests—and to pay the entry fees for the contests—with the understanding that they could compete to earn winnings.

90.     This, however, was not possible, given DraftKings's arbitrary decision to cancel the relevant DFS contests and to refuse to pay out the winnings in those contests to which Plaintiff and Class Members were entitled, in direct violation of the applicable rules.

91.     Plaintiff and other Class Members were harmed as a result, because they were not paid the winnings to which they were entitled, by virtue of their participation in the relevant DFS contests and the applicable rules governing the suspension of NFL games—which applied on January 2, 2023 and January 3, 2023, when DraftKings decided to cancel the contests.

92.     As a direct and proximate result of DraftKings's deceptive acts and practices, including their representations and omissions, Plaintiff and Class Members have been damaged as alleged herein, and are entitled to recover the greater of actual damages or $50 statutory damages per contest in which they were entitled to winnings.

93.     In addition, Plaintiff and Class Members seek equitable and injunctive relief against DraftKings on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF
#### VIOLATION OF THE NEW YORK FALSE ADVERTISING LAW
#### N.Y. G.B.L. § 350, *et seq.*
#### (On behalf of Plaintiff Turley and the proposed Class)

94.     Plaintiff reasserts and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

95.     New York General Business Law § 350 ("NY GBL § 350") prohibits "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

96.     Under NY GBL § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." *Id.* § 350-a(1).

97.     DraftKings's foregoing acts and practices were directed at consumers.

98.     DraftKings's foregoing acts and practices occurred in the course of its business of offering DFS contests to customers, including Plaintiff and Class Members.

99.     DraftKings violated NY GBL §350 by misrepresenting, omitting, concealing, or failing to disclose material facts in listings for, advertisements for, information for, or the rules of the relevant DFS contests, or elsewhere on DraftKings's website regarding DraftKings's ability to arbitrarily cancel DFS contests at its discretion, even when in direct violation of the applicable rules.

100.    In listing and offering the relevant DFS contests on its website, DraftKings presented to customers, including Plaintiff and Class Members, the opportunity to enter the relevant DFS contests for an opportunity to compete to win the listed winnings.

101.    DraftKings presented rules applicable to the relevant DFS contests, which would be binding and controlling on participants in the contests and would govern how DraftKings could run the contests.

102.    Contrary to the representations made to customers, and directly contrary to the applicable rules for the relevant DFS contests, DraftKings arbitrarily canceled the relevant DFS contests.

103.    DraftKings omitted, concealed, and failed to disclose the fact that it, apparently, reserved a right to cancel contests at its sole discretion, and could—and would—ignore the governing rules applicable to the relevant DFS contests to refuse to pay out winnings to which participants, including Plaintiff and Class Members, were entitled.

104.    DraftKings's foregoing, consumer-oriented, unfair or deceptive acts and practices, as described above and herein, including its advertising, representations, and omissions, constitute

false and misleading advertising in violation of NY GBL § 350.

105.    The fact that DraftKings listed and offered the relevant DFS contests on its website, in part, induced customers to participate in the relevant DFS contests—and to pay the entry fees for the contests—with the understanding that they could compete to earn winnings.

106.    This, however, was not possible, given DraftKings's arbitrary decision to cancel the relevant DFS contests and to refuse to pay out the winnings in those contests to which Plaintiff and Class Members were entitled, in direct violation of the applicable rules.

107.    DraftKings's false and misleading advertising, representations, and omissions have resulted in consumer injury or harm to the public interest.

108.    DraftKings's false and misleading advertising, representations, and omissions have caused actual damages to Plaintiff and Class Members who were unaware that DraftKings could and would cancel the relevant DFS contests in violation of applicable rules and refuse to pay out winnings to which they were entitled. Had DraftKings disclosed this, Plaintiff and Class Members would not have participated in the relevant DFS contests, including by not paying the entry fees for the contests.

109.    Plaintiff and other Class Members were harmed as a result, because they were not paid the winnings to which they were entitled, by virtue of their participation in the relevant DFS contests and the applicable rules governing the suspension of NFL games—which applied on January 2, 2023 and January 3, 2023, when DraftKings decided to cancel the contests.

110.    As a direct and proximate result of DraftKings's false and misleading advertising, including their representations and omissions, Plaintiff and Class Members have been damaged as alleged herein, and are entitled to recover the greater of actual damages or $500 statutory damages per contest in which they were entitled to winnings.

111.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against DraftKings on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff Turley and the proposed Class)**

112.    Plaintiff reasserts and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

113.    As described herein, DraftKings misrepresented, omitted, concealed, or failed to disclose material facts in listings for, advertisements for, information for, or the rules of the relevant DFS contests, or elsewhere on DraftKings's website regarding DraftKings's ability to arbitrarily cancel DFS contests at its discretion, even when in direct violation of the applicable rules.

114.    DraftKings omitted, concealed, and failed to disclose the fact that it, apparently, reserved a right to cancel contests at its sole discretion, and could—and would—ignore the governing rules applicable to the relevant DFS contests to refuse to pay out winnings to which participants, including Plaintiff and Class Members, were entitled.

115.    Contrary to DraftKings's representations to its customers, including Plaintiff and Class Members, that it would pay out winnings in the relevant DFS contests in accordance with applicable rules, DraftKings instead decided to arbitrarily cancel the relevant DFS contests in direct violation of the rules and refused to pay out winnings to which Plaintiff and Class Members were entitled.

116.    Due to its misrepresentations and omissions, DraftKings has knowingly and unjustly been enriched at the expense of and to the detriment of Plaintiff and the Class Members by collecting excess profits to which it is not entitled. Specifically, DraftKings received and

accepted entry fees from Plaintiff and Class Members for the relevant DFS contests and refused to pay out winnings to which they were entitled. The amount of these winnings to which Plaintiff and each Class Member is entitled exceed the entry fee each paid.

117.    DraftKings's refusal to pay out these winnings—or at a minimum to pay out the difference between the winnings and the refunded entry fee—represents profits and ill-gotten gains that DraftKings has improperly and unjustly retained. DraftKings should be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of each of the proposed Class described in this Complaint, respectfully requests the Court to enter an Order:

A.    certifying the proposed Classes under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), and, in the alternative, (c)(4) as set forth above;

B.    declaring that DraftKings is financially responsible for notifying the Class Members of the pendency of this suit;

C.    declaring that DraftKings has committed the violations of law alleged herein;

D.    providing for any and all injunctive relief the Court deems appropriate;

E.    awarding statutory damages in the maximum amount for which the law provides;

F.    awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.    providing for any and all equitable monetary relief the Court deems appropriate;

H.    awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I.      awarding Plaintiff and the other Class Members their reasonable costs and expenses

of suit, including attorneys' fees;

J.      awarding pre-and post-judgment interest to the extent the law allows; and providing

such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

trial by jury on all claims so triable.


Dated: January 9, 2023                          Respectfully submitted,

                                                */s/ Alex R. Straus*
                                                Alex R. Straus (BBO: 677434)
                                                **MILBERG COLEMAN BRYSON**
                                                 **PHILLIPS GROSSMAN PLLC**
                                                280 S. Beverly Drive, PH Suite
                                                Beverly Hills, CA 90212
                                                Tel: (917) 471-1894
                                                Fax: (310) 496-3176
                                                *astraus@milberg.com*

                                                Adam E. Edwards
                                                William A. Ladnier
                                                **MILBERG COLEMAN BRYSON**
                                                 **PHILLIPS GROSSMAN PLLC**
                                                800 S. Gay Street, Suite 1100
                                                Knoxville, TN 37929
                                                Tel: (865) 247-0080
                                                *aedwards@milberg.com*
                                                *wladnier@milberg.com*

                                                Mitchell Breit
                                                **MILBERG COLEMAN BRYSON**
                                                 **PHILLIPS GROSSMAN PLLC**
                                                405 East 50th Street
                                                New York, New York 10022
                                                Tel: (347) 668-8445
                                                *mbreit@milberg.com*

Luke P. Hudock, Esq.
**HUDOCK LAW GROUP, S.C.**
P.O. Box 83
Muskego, WI 53150
Tel.: (414) 526-4906
*lphudock@law-hlg.com*


*Attorneys for Plaintiff*
*and the Proposed Class*