UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SIMPSON G. TURLEY and ERIK J. RAMOS, individually and on behalf of all others similarly situated, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 23-cv-10054-ADB |
| DRAFTKINGS INC. and DRAFTKINGS HOLDINGS INC., | * * * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

      Simpson G. Turley ("Turley") and Erik J. Ramos ("Ramos") (collectively, "Plaintiffs") filed this action against DraftKings Inc. and DraftKings Holdings Inc. (collectively, "DraftKings"), which "operate and market online and retail daily fantasy sports competitions and sports betting services." [ECF No. 30 ("Amended Complaint" or "Am. Compl.") ¶ 1]. Plaintiffs allege that by cancelling and refunding several "daily fantasy sports" ("DFS") competitions associated with the January 2, 2023 National Football League game between the Buffalo Bills and the Cincinnati Bengals (the "Game"), DraftKings violated various contractual, common law, and statutory obligations. See [id. ¶¶ 6–9]. Plaintiffs brings these claims on behalf of themselves and a putative class of individuals who they allege were similarly harmed by DraftKings' conduct. [Id. ¶ 9]. Pending before the Court is DraftKings' motion to dismiss and strike the Amended Complaint, [ECF No. 34], which, for the reasons that follow, is GRANTED in part and DENIED as moot in part.

I.      BACKGROUND

     A.      **Factual Background**

The facts are drawn primarily from the Amended Complaint. As it must, the Court "accept[s] the truth of all well-pleaded facts and draw[s] all reasonable inferences therefrom." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012).

         i.      DraftKings' Contests

DraftKings offers fantasy sports competitions associated with multiple sports leagues, including the NFL. [Am. Compl. ¶ 17]. Thousands of customers participate in DraftKings' NFL fantasy football competitions each week—"including in daily, in-game, weekend-long, and season-long contests." [Id.]. As part of these competitions or contests ("Contests"), customers "[d]raft a lineup of NFL players," [id. ¶ 4 (alteration in original)], and accrue points based on their players' performance statistics in games, including for touchdowns and yards gained, [id.]. According to DraftKings, "[i]f your lineup scores enough points, you'll win cash prizes—even if you don't come in first." [Id.]. "[N]early all" of the NFL Contests have an entry fee. [Id. ¶ 17].

DraftKings has various NFL Contest types: "NFL Showdown," "NFL In-Game Showdown," "NFL Pick," "NFL Classic," "NFL Tiers," and "Flash Draft," among others. See [Am. Compl. ¶¶ 21, 24, 43]. Both Plaintiffs participated in Showdown Contests associated with the Game. [Id. ¶¶ 53, 63]. Plaintiffs and the putative class also raise claims related to DraftKings' Flash Draft Contests, though neither of the Plaintiffs participated in a Flash Draft Contest associated with the Game. See generally [id.].

         ii.     The Game

The Game was scheduled for "Monday, January 2, 2023, as part of Week 17 of the NFL's 2022 regular season." [Am. Compl. ¶ 30]. It started, as scheduled, at approximately 8:30

PM.  [Id.].

> The Cincinnati Bengals received the opening kickoff.  While on offense, the Bengals scored a passing touchdown and [a point after the touchdown].  After the ensuing kickoff, the Buffalo Bills went on offense and scored a field goal.  At that point in the [G]ame, the score was 7-3 in favor of the Cincinnati Bengals, with numerous players from both teams accumulating statistics (and thus, accumulating points in the fantasy football [C]ontests).
>
> Shortly thereafter, with 5:58 left to play in the [first] quarter—shortly after making a tackle on Cincinnati Bengals wide receiver Tee Higgins, Buffalo Bills safety Damar Hamlin collapsed on the field when he suffered a cardiac arrest.  Hamlin received immediate medical assistance on the field and was taken to a local hospital.

[Am. Compl. ¶¶ 31–32].

The Game was stopped while medical assistance was being provided to Hamlin.  [Am. Compl. ¶ 36].  Shortly thereafter, the NFL issued a statement that the Game had been "postponed" and that "[t]he NFL ha[d] been in constant communication with the NFL Players Association which [was] in agreement with postponing the [G]ame" ("NFL's January 2 Statement").  [Id.].  At the same time, news outlets were reporting that the Game had been "suspended" (rather than postponed).  [Id. ¶ 38].  The DraftKings website also showed that the Game has been "suspended."  See, e.g., [id. ¶ 56 (screenshot)].

On the following day, January 3, 2023, the NFL issued another statement that (1) the Game would not be resumed that week, and (2) a decision had not been made as to whether the Game would be resumed at a later date ("NFL's January 3 Statement").  [Am. Compl. ¶ 39].

Later the same day, on January 3, 2023, DraftKings informed customers, via email, that "[w]ith the NFL announcing the [Game] will not be resuming this week, per our house rules, all wagers on the [Game] that have not been determined, such as spreads and money lines, have been voided" ("Cancellation Email").  [Am. Compl. ¶ 42 (quoting ECF No. 30-1)].  It also stated that "[f]or DFS, entries for Showdown and Flash Draft contests will be canceled and refunded."

3

[Id. ¶ 43 (quoting ECF No. 30-1)]. On the other hand, DraftKings also noted that "it would . . . pay out participants in certain other NFL fantasy football contests with the statistics from the [Game] included." [Id. ¶ 42]. This meant that "the statistics accrued in the [Game] up to the point at which the . . . [Game was stopped]—and necessarily, the points scored in fantasy football up to that point based on that [G]ame—would apply . . . in [some but not all] . . . contests[.]" [Id. ¶ 44]. This included "NFL Classic Contests," in which

> DraftKings determined that the "current, accrued points" based on statistics from the [Game] would apply . . . , with the currently leading participants in those contests receiving credit for points accrued up to that point (based upon statistics from the [Game] up to the point it was suspended) and their winnings—rather than canceling the contests and offering refunds.

[Id.].

Several days later, on January 5, 2023, "the NFL officially canceled the [Game], calling it a no-contest." [Am. Compl. ¶ 6 n.5].

### iii. Plaintiffs' Participation in Game Contests

Plaintiff Turley is a resident of New York. [Am. Compl. ¶ 13]. Plaintiff Ramos is a resident of Florida. [Id. ¶ 14]. They both maintain DraftKings accounts and entered one or more Contest associated with the Game. [Id. ¶¶ 13–14].

Turley participated in two Showdown Contests associated with the Game—"NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)," and the "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)." [Am. Compl. ¶ 53]. He paid an entry fee of $222 for the first contest and $444 for the second. [Id.]. "As part of these contests, . . . Turley drafted multiple players to his fantasy football team from the Buffalo Bills and Cincinnati Bengals teams." [Id. ¶ 54]. At the time the Game was stopped, Turley's team "had accrued 23.35 points," placing it (i.e., him) in first place "in the 'NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)' contest," and in "second place in the 'NFL Showdown

$15K Four-Point Stance [Single Entry] (BUF vs CIN).'"  [Id. ¶¶ 56–57].  Per the DraftKings website, at this point, Turley's "winnings totaled" $5,000 in the first contest and $3,000 in the second.  [Id.].

On January 3, 2023, Turley received the Cancellation Email from DraftKings discussed above, explaining that "all 'entries for Showdown and Flash Draft contests [were being] canceled and refunded.'"  [Am. Compl. ¶ 58 (alteration in original)].  Thereafter, his entries in "NFL Showdown $20K Two Point Conversion [$5K to 1st] (BUF vs CIN)" and the "NFL Showdown $15K Four-Point Stance [Single Entry] (BUF vs CIN)" were cancelled and his entry fees were fully refunded to his DraftKings account.  [Id.].

Ramos participated in one Showdown Contest associated with the Game—"NFL Showdown $2.25M Monday Night Finale Millionaire [$1M to 1st] (BUF vs CIN)."  [Am. Compl. ¶ 63].  Based on his purchase of 150 entries for the contest, each costing $25, he paid $3,750 in fees in total.  [Id.].  Like Turley, "[a]s part of this contest, . . . Ramos drafted multiple players to his fantasy football team from the Buffalo Bills and Cincinnati Bengals teams."  [Id. ¶ 64].  When Game play was stopped, "one of Plaintiff Ramos's entries . . . had accrued 36.64 points and was tied for first place with other contestants."  [Id. ¶ 66].  The DraftKings website showed that "Ramos' winnings for that entry [were] $133,777.77" and that his winnings for all 150 entries totaled $136,051.07.  [Id. ¶¶ 66–67].

On January 3, 2023, Ramos too received the Cancellation Email stating that "all 'entries for Showdown and Flash Draft contests [were being] canceled and refunded.'"  [Am. Compl. ¶ 68 (alteration in original)].  "All 150 of Plaintiff Ramos's entries in the 'NFL Showdown $2.25M Monday Night Finale Millionaire [$1M to 1st] (BUF vs CIN)' contest were cancelled" and his entry fees were fully refunded to his DraftKings account.  [Id.].

5

As noted above, neither Turley nor Ramos participated in any Flash Draft Contests associated with the Game.  See generally [Am. Compl.].

### B. Procedural Background

Plaintiffs filed their original complaint on January 9, 2023.  [ECF No. 1].  They filed the operative Amended Complaint on May 8, 2023, [ECF No. 16], alleging breach of contract, on behalf of Plaintiffs and the putative class (Count I); violations of: New York General Business Law § 349, on behalf of Turley and the putative class (Count II), New York General Business Law § 350, New York's False Advertising Law, on behalf of Turley and the putative class (Count III); and Massachusetts General Laws Chapter 93A, on behalf of Plaintiffs and the putative class (Count IV); and unjust enrichment, on behalf of Plaintiffs and the putative class (Count V); [Am. Compl. ¶¶ 84–153].

On June 12, 2023, DraftKings moved to dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), and to strike certain class allegations, pursuant to Rule 12(f).  [ECF No. 34].  Plaintiffs opposed the motion on July 17, 2023.  [ECF No. 39].

## II. RULE 12(B)(6)

### A. Legal Standard

Under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  This pleading standard requires "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  When evaluating

the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Cardigan Mountain Sch., 787 F.3d at 84 (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotations omitted). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" García-Catalán, 734 F.3d at 103 (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)). In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

**B.     Discussion**

    i.     Count I (Breach of Contract)

"A breach of contract claim under Massachusetts law requires proof that the parties had a valid agreement, the defendant breached the agreement, and the plaintiff sustained damages" as a result of the defendant's breach. Guarriello v. Fam. Endowment Partners, LP, No. 14-cv-13351, 2016 WL 7799639, at *12 (D. Mass. Aug. 10, 2016) (citing Michelson v. Dig. Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999)).[1]

---

[1] Neither party addresses choice of law for Plaintiffs' breach of contract claim, though Plaintiffs largely rely on Massachusetts law, [ECF No. 39 at 10–19], and DraftKings largely on New York law and some Massachusetts law, [ECF No. 35 at 12–17; ECF No. 45 at 6–11]. DraftKings' Terms of Use state that they "shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles." [ECF No. 36-3 at 12]. Although Plaintiffs did not attach a copy of the Terms of Use to the Complaint, DraftKings attached one to their Motion at ECF No. 36-3. "[W]hen 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged [as is the case here]),' then the court can review it upon a motion to dismiss." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 34 (1st Cir. 2001) (quoting Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998)). Based

Plaintiffs allege that (1) they "entered into a valid and enforceable agreement with DraftKings to participate in the relevant DFS contests for the applicable entry fee with the understanding that Plaintiffs and Class Members were competing in the relevant DFS contests for the potential winnings, as listed for each contest and by DraftKings[;]" (2) "in creating their DraftKings accounts, Plaintiffs and Class Members, along with DraftKings, agreed to be bound by DraftKings'[] Terms of Use[;]" and (3) "[t]hese Terms of Use, as a condition of participation in DraftKings and its contests, require[] that DraftKings and contest participants not violate the contest rules."  [Am. Compl. ¶¶ 86–87].

Plaintiffs further allege that DraftKings breached this agreement on "January 3, 2023, when [it] announced its decision to 'cancel[] and refund[]' Showdown and Flash Draft contests," [ECF No. 39 at 18 (alterations in original) (citing Am. Compl. ¶¶ 42–43, 92)], and "by refusing to pay out the winnings to which Plaintiffs and Class Members were entitled by virtue of their accrued points and placement in the relevant DFS contests at the time when the [Game] was suspended, in direct violation of DraftKings'[] own established rules, the rules of each relevant DFS contest, and its Terms of Use[,]" [Am. Compl. ¶ 92].  Plaintiffs further assert that DraftKings' conduct violated the specific provisions of the DFS Contest Rules concerning Suspended or Shortened Games ("Suspended or Shortened Provisions"), [id. ¶¶ 25–26, 45–49, 51–52, 92], which provide that

> DraftKings uses official NFL statistics and only includes statistics from games NFL deems to be official.  If the NFL declares a game "suspended" then the statistics generated before the game is suspended will count in Game Sets containing said game.  Any statistics generated on a later date when the game resumes will not be included.

---

on the plain language of this provision and Plaintiffs' allegation that the parties agreed to be bound by the Terms of Use, the Court will apply Massachusetts law to this claim.

[Id. ¶¶ 25, 60].[2]

According to Plaintiffs, the NFL's January 2 Statement that the Game was "postponed," [Am. Compl. ¶ 36], was tantamount to declaring the Game "suspended," [id. ¶ 37], per the definition of postponement in the NFL Policy Manual for Member Clubs ("NFL Policy Manual"), which "governs game operations," [id. ¶ 33]. As Plaintiffs aver is relevant here, the NFL Policy Manual defines "postpon[ing] a game" as either "(a) defer[ring] [a game's] starting time to a later time or date, or (b) suspend[ing] it after play has begun and mak[ing] provision to resume it at a later date/time with all scores and other performance statistics up to the point of postponement added to those achieved in the resumed portion of the game." [Id.]. Based on this definition, Plaintiffs claim that the NFL's January 2 Statement functionally "declare[d]" the Game "suspended," thus triggering the Suspended or Shortened Provision. [Id. ¶ 34]. Plaintiffs also allege that the Game was, in fact, suspended, see, e.g., [id. ¶¶ 49, 55], and note that news outlets were reporting that the Game had been "suspended," [id. ¶ 38].

DraftKings raises a number of arguments for dismissal. For one, DraftKings argues that "[e]ven assuming that the NFL intended to 'suspend' the Game and that the statistics accrued were official [thus, implicating the Suspended or Shortened Provision's requirement to "count" "the statistics generated before the game is suspended . . . in Game Sets containing said game"], DraftKings [nonetheless] acted within its Showdown Rules by cancelling and refunding the Contests [on January 3,] once the NFL announced the Game would not be resumed that week," in accord with the Cancelled, Postponed, and Rescheduled Games provision ("Cancelled, Postponed, or Rescheduled Provision"). [ECF No. 35 at 17]. Additionally, as the parties agree,

---

[2] Although this is the Showdown Contest's Suspended or Shortened Provision, [Am. Compl. ¶¶ 25, 60], Plaintiffs allege, on information and belief, that DraftKings' conduct also violated the Flash Draft Rules, which are not available online, [id. ¶ 45 n.24].

9

"the Game was later cancelled [on January 5,] and [according to DraftKings,] there is no dispute that DraftKings complied with the Showdown Rules for cancelled games." [Id. at 13, 17].

The Cancelled, Postponed, or Rescheduled Provision states:

In the event that a game is cancelled or postponed & rescheduled to a time outside of the original Scoring Period, DraftKings will cancel and refund all contests. If the game is rescheduled within the Scoring Period & this change is made less than 24 hours before the Game Set's lock, the game will be included in the Game Set and players listed to play in that game will be eligible to accrue points.

The Scoring Period for NFL is defined as the timeframe between the scheduled start of the first game within the Game Set and 11:59pm ET on the first Wednesday after the last scheduled game within the Game Set.

In the event a game is postponed, DraftKings will make a decision no later than 11:59pm ET of the day of the game on how to handle the postponed game.

DraftKings may choose to adjust the Scoring Period for a Game Set at their sole discretion to accommodate schedule changes to any time before 12:00am ET on the day after the Game Set is scheduled.

[ECF No. 36-2 at 4].[3]

Plaintiffs respond that DraftKings' January 3 Cancellation Email also failed to comply with this provision, because it was sent the day after the Game and therefore DraftKings failed to "make a decision no later than 11:59pm ET of the day of the game[, January 2,] on how to handle the postponed game." [ECF No. 39 at 15–16 (alteration in original) (quoting [ECF No. 36-2 at 4])]. At the same time, Plaintiffs argue that "[a]t a minimum, DraftKings could have (and should have) waited until the NFL cancelled the [G]ame [on January 5] to take any action." [Id. at 13]. Nevertheless, according to Plaintiffs, the fact that the Game was eventually cancelled on January 5 is irrelevant, since it occurred after the breach, on January 3. [Id. at 17–19].

---

[3] As discussed above, although Plaintiffs did not attach a copy of the Showdown Rules to the Complaint, where DraftKings attached one to their Motion at ECF No. 36-2, and Plaintiffs do not challenge its authenticity, the Court may consider the entirety of the Showdown Rules on a motion to dismiss. See Alt. Energy, Inc., 267 F.3d at 34.

The Court concludes that Plaintiffs have failed to allege a plausible breach of contract claim. To begin, as noted above, although Plaintiffs take issue with the timing of DraftKings' cancellation of the Showdown and Flash Draft Contests, which occurred a day after the Game, they concede that DraftKings "could have . . . take[n] . . . action" several days later, once the NFL announced that the Game was cancelled on January 5. [ECF No. 39 at 13]. As such, Plaintiffs, in essence, concede that, at the time of DraftKings' Cancellation Email, the Contests had not yet concluded and any entitlement to winnings as of January 2 was speculative, as those winnings continued to be dependent on and subject to future actions by the NFL and/or DraftKings. This makes sense give that, per the Terms of Use's "Contest Results" provision, "DraftKings' contest results 'are based on the *final* statistics[.]'" [ECF No. 45 at 9 (emphasis added) (quoting ECF No. 36-3 at 7)]. It therefore does not appear to the Court that that Plaintiffs suffered any concrete injury, that is, non-hypothetical injury, or damages, as a result of DraftKings cancelling the Showdown and Flash Draft Contests on January 3.

Additionally, as DraftKings notes,

> the Terms of Use also provide: (1) "We reserve the right to cancel Contests at any time. In the event of a cancellation, all entry fees will be refunded to the customer"; [and] (2) "If for any reason a Contest is not capable of running as originally planned . . . or if . . . any other causes of any kind, in the sole opinion of DraftKings . . . affects the administration, security, fairness, integrity, or proper conduct of a Contest, the Company reserves the right, at its sole discretion, to . . . cancel [or] terminate . . . the Contest[.]"

[ECF No. 35 at 19 (citing ECF No. 36-3 at 6)]. DraftKings argues that, in cancelling the Showdown and Flash Draft Contests following the NFL's January 3 Statement it "acted fairly." [ECF No. 45 at 9]. "Had DraftKings not canceled the Contests, which were based on a few minutes of play in a single football game, the entrants who lost their entry fees would have claimed that *they* were treated unfairly. DraftKings was well within its rights under the Terms of

11

Use to cancel the Contests and refund entry fees on fairness grounds." [Id.]. The Court finds that, regardless of when DraftKings announced their cancellation, DraftKings was within its reserved right to cancel the Showdown and Flash Draft Contests, based on its determination of what was fair, given the unfortunate circumstances of the Game.[4] The fact DraftKings did not cancel other Contests that Plaintiffs have not alleged they entered is not relevant to any alleged breach here, particularly since Plaintiffs have not alleged they had any agreements or contractual relationships with Defendants as to these other Contests. See generally [Am. Compl.]. Further, where those other Contests all involved statistics from other games, and the Showdown and Flash Draft Contests implicated only the Game, DraftKings acted fairly in only cancelling the Showdown and Flash Draft contests, and did not breach the parties' agreement in doing so.

As such, DraftKings' motion to dismiss Count I is GRANTED.

---

[4] Although there is relatively little caselaw on at-will cancellation provisions, "[o]ther jurisdictions . . . tend towards allowing the[m] to stand[,]" so long as enforcement "does not render the contract illusory . . . [and any] . . . cancellation was not fraudulent or made in bad faith." Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs., No. 18-cv-00633, 2021 WL 1313108, at *5 (E.D. Pa. Apr. 8, 2021) (first citing Englert v. Nutritional Scis., LLC, No. 07AP989, 2008 WL 4416597, at *7 (Ohio Ct. App. Sept. 30, 2008) ("allowing contest sponsor to reduce award amount after choosing winner because terms of contest stated defendant could modify terms any time before awarding prize"); then citing McBride v. N.Y.C. Off-Track Betting Corp., 410 N.Y.S.2d 868, 869 (App. Div. 1978) ("allowing defendant to cancel tickets with which plaintiff had correctly betted on horses because defendant explicitly reserved right to cancel at any time"); then citing Englert, 2008 WL 4416597, at *5 ("holding that defendant's obligations under contest agreement were not illusory and unfettered because defendant's right to modify was limited to any time before winner claimed her prize"); then citing McBride, 410 N.Y.S.2d at 868 ("In the absence of some specific allegation of fraud, [defendant] is not liable to the plaintiffs for a winner's share in the Pick-Four." (citation omitted)); and then citing Giunto v. Fla. Coca-Cola Bottling Co., 745 So. 2d 1020, 1022 (Fla. Dist. Ct. App. 1999) ("listing cases holding that contest participants are bound by decisions of sponsor absent fraud or bad faith")).

Plaintiffs allege in the context of their statutory claims, Counts II–IV, that although these provisions were included in the Terms of Use, "DraftKings omitted, concealed, and failed to disclose the fact that it, apparently, reserved a right to cancel contests at its sole discretion." See, e.g., [Am. Compl. ¶ 121]. Plaintiffs do not otherwise challenge the enforceability of these provisions.

> ii. Counts II–IV (New York General Business Laws §§ 349, 350, Massachusetts Chapter 93A)

"[T]o state a claim under sections 349 or 350, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice." Plavin v. Grp. Health Inc., 146 N.E.3d 1164, 1168 (N.Y. 2020) (internal quotation and citation omitted). Similarly, under Massachusetts Chapter 93A, "[a] successful claim requires a showing of 1) a deceptive act or practice on the part of the defendant, 2) an injury or loss suffered by the plaintiff and 3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury." Gorbey ex rel. Maddox v. Am. J. of Obstetrics & Gynecology, 849 F. Supp. 2d 162, 165 (D. Mass. 2012) (citing Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 447–48 (D. Mass. 2012) (citing Hershenow v. Enter. Rent–A–Car Co., 840 N.E.2d 526, 532 (Mass. 2006))), aff'd sub nom. A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77 (1st Cir. 2013).

> Plaintiffs allege that
>
> DraftKings violated NY GBL §[§] 349[, 350,] [and Chapter 93A] by misrepresenting, omitting, concealing, or failing to disclose material facts in listings for, advertisements for, information for, or the rules of the relevant DFS contests, or elsewhere on DraftKings's website regarding DraftKings's ability to arbitrarily cancel DFS contests at its discretion, even when in direct violation of the applicable rules.

[Am. Compl. ¶¶ 101, 117, 134]. Plaintiffs further allege, as to all Claims (Counts II-IV), that but-for DraftKings' alleged misconduct, "Plaintiffs and Class Members would not have participated in the relevant DFS contests." [Id. ¶ 126 (New York GBL § 350)]; see also [id. ¶¶ 107, 109, 140, 142 (explaining that Plaintiffs were harmed by DraftKings' alleged violations of New York GBL § 349 and Massachusetts Chapter 93A which "induced customers to participate in the relevant DFS contests")].

DraftKings again raises several arguments as to why these claims must be dismissed, including that "Plaintiffs were not injured as a result of DraftKings' conduct." [ECF No. 35 at 18]. Plaintiffs respond that they did suffer actual injury, because "[a]t the point the [G]ame was suspended, . . . Turley had accrued sufficient fantasy points to be ranked in first and second place in his contests, entitling him to $8,000.00 . . . [and] Ramos was denied at least $136,051.07 to which he was entitled." [ECF No. 39 at 20 (citations omitted)].

First, as discussed above, Plaintiffs have failed to sufficiently allege non-speculative, non-hypothetical entitlement to any winnings. Additionally, even assuming they were entitled to winnings, the loss of those winnings was only possible because they entered the Contests. Had Plaintiffs not participated in the Contests, which they allege they would not have done but-for DraftKings' inducement, they would not have been entitled to or even eligible for any winnings. Thus, the loss of any winnings cannot be the basis for a claim premised on improper inducement.

The Court concludes that Plaintiffs have failed to plausibly allege that they suffered an injury as a result of DraftKings' alleged misconduct and have therefore failed to state a claim under New York General Business Laws §§ 349, 350 or Massachusetts Chapter 93A. DraftKings' motion to dismiss Counts II–IV is therefore <u>GRANTED</u>.

        iii.        <u>Count V (Unjust Enrichment)</u>

Under both Massachusetts and New York law,[5] unjust enrichment is defined as "retention

---

[5] The parties again do not address choice of law for this claim; Plaintiffs rely on Massachusetts law, see [ECF No. 39 at 22], and DraftKings on New York and Massachusetts law, [ECF No. 35 at 22–23; ECF No. 45 at 13–14]. The Court concludes that it need not determine which law to apply because "the elements of unjust enrichment are substantially similar in New York and Massachusetts." Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec., 450 F. Supp. 3d 20, 34 (D. Mass. 2020) (first citing In re Interior Molded Doors Antitrust Litig., No. 18-cv-00718, 2019 WL 4478734, at *22 (E.D. Va. Sept. 18, 2019); and then citing Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 20 (D. Mass. 2010)). "A federal court sitting in diversity need not make a finding

of money or property of another against the fundamental principles of justice or equity and good conscience." Fine, 450 F. Supp. 3d at 35 (quoting Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40, 52 (D. Mass. 2013) (quoting Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005)), amended in part (July 1, 2013)); see also id. ("In New York, '[t]he essence of . . . a cause of action [for unjust enrichment] is that one party is in possession of money or property that rightly belongs to another.'" (alterations in original) (quoting Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC, 819 N.Y.S.2d 182, 187 (N.Y. App. Div. 2006))). "Massachusetts courts emphasize the primacy of equitable concerns in a finding of unjust enrichment or quasi-contract." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985)), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009). It is "not a catchall cause of action to be used when others fail." Cooper v. Anheuser-Busch, LLC, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021) (quoting Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012)). "Rather, the claim 'is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.'" Id. (quoting Corsello, 967 N.E.2d at 1185).

As such, "[a] claim for unjust enrichment requires three elements: '(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value.'" Koufos, 939 F. Supp. 2d at 52 (citing

---

regarding which state's law is to be applied where the case's resolution would be identical under either state's law." Id. at 34–35 (quoting Fratus v. Republic W. Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998)).

Mass. Eye & Ear Infirmary, 552 F.3d at 57); see also Gustavsen v. Alcon Laboratories, Inc., 272 F. Supp. 3d 241, 249 (D. Mass. 2017) ("The elements of an unjust enrichment claim under New York law are: (1) the defendants were enriched; (2) at the plaintiffs' expense; and (3) 'it is against equity and good conscience to permit [the defendants] to retain what is sought to be recovered.'" (quoting Mandarin Trading Ltd. v Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011))), aff'd, 903 F.3d 1 (1st Cir. 2018).

DraftKings argues that "this is not the type of 'unusual situation[]' courts recognize as warranting extraordinary equitable relief." [ECF No. 35 at 23 (alteration in original) (quoting Cooper, 553 F. Supp. 3d at 115)]. The Court agrees. As discussed above, the Court finds that DraftKings complied with the terms of the parties' agreement. Likewise, DraftKings refunded Plaintiffs' entry fees, such that Plaintiffs were left in the same position as if they had never participated in the Contests. This is not the sort of inequitable situation that justifies a claim for unjust enrichment.

DraftKings' motion to dismiss Count V is therefore GRANTED.

**III.     RULE 12(F)**

DraftKings also moves to strike the class allegations related to the Flash Draft Contests, arguing that Plaintiffs lack standing to bring claims related to Contests in which they did not participate. [ECF No. 35 at 24–25]. "As a result of the allowance of defendant's motion to dismiss [all claims], it is unnecessary to address its separate motion to strike [these] class claims from the complaint. That motion will be denied as moot." Pershouse v. L.L. Bean, Inc., 368 F. Supp. 3d 185, 192 (D. Mass. 2019).

IV.     CONCLUSION

DraftKings' motion, [ECF No. 34], is <u>GRANTED</u> in part and <u>DENIED</u> in part. The motion to dismiss the Amended Complaint, is <u>GRANTED</u>, and the motion to strike class allegations, is <u>DENIED</u> as moot.

**SO ORDERED.**

March 29, 2024                                                              <u>/s/ Allison D. Burroughs</u>
                                                                                       ALLISON D. BURROUGHS
                                                                                       U.S. DISTRICT JUDGE